## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| WELLINGTON CORP LLC, | ) | Case No. 4:19-cv-01464 |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) ) | Judge J. Philip Calabrese |
| | ) | Magistrate Judge |
| v. | ) | Carmen E. Henderson |
| | ) | |
| GENNARI CONSULTING, INC., | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff, | ) ) | |
| | ) | |
| and | ) | |
| | ) | |
| MATTHEW GENNARI, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ROBERT KUNDEL, JR. | ) | |
| | ) | |
| Third-Party Defendant. | ) | |
| | ) | |

## OPINION AND ORDER

For use in his family business, Robert Kundel invented and patented a power tool.  Realizing its commercial potential, Mr. Kundel sought to bring the power tool to market.  Toward that end, he established a business relationship with Matthew Gennari.  Mr. Kundel and Mr. Gennari formalized this relationship by causing their respective companies, Wellington Corp and Gennari Consulting, to enter a gross profit distribution agreement granting the parties rights and responsibilities related to the development and sale of Mr. Kundel's patented power tool.

The parties' business venture took a turn for the worse, causing the disputes at issue in this litigation.  On one side, Mr. Kundel's company Wellington Corp brings claims for breach of contract and tortious interference against Mr. Gennari and his company Gennari Consulting.  On the other, Gennari Consulting raises counterclaims against Mr. Kundel and Wellington Corp for breach of contract, unjust enrichment, and conversion and civil theft.  Mr. Gennari and Gennari Consulting move for summary judgment on the claims against them (ECF No. 73), while Mr. Kundel and Wellington Corp seek summary judgment on Gennari Consulting's counterclaims (ECF No. 74).  For the following reasons, the Court **GRANTS** the Gennari Defendants' motion for summary judgment (ECF No. 73) and **GRANTS IN PART** and **DENIES IN PART** Wellington Corp's and Mr. Kundel's motion for summary judgment (ECF No. 74).

## STATEMENT OF FACTS

Robert Kundel, Jr. invented a power tool to remove rust from pipes and beams to use in his family business.  (ECF No. 76, PageID #1489–90.)  On July 9, 2013, Mr. Kundel received a patent for the tool.  (*Id.*, PageID #1482; ECF No. 6, ¶ 8, PageID #37; ECF No. 73, PageID #883.)  Later, Mr. Kundel formed Wellington Corp LLC to facilitate the sale of his patented power tool for commercial purposes.  (ECF No. 76, PageID #1471–72 & #1478.)

### A.  Relevant Agreements

Through Wellington Corp, Mr. Kundel, entered into several agreements related to his patented power tool.

### A.1.    Stanley Black & Decker

To bring his power tool to market, Mr. Kundel connected with John Cunningham at Stanley Black & Decker.  In March 2014, after some negotiations, Mr. Kundel and Wellington Corp entered into a joint development agreement with Stanley Black & Decker to license the patent.  (ECF No. 74-3, PageID #1115–24; ECF No. 76, PageID #1486.)  A few months later, during the process of bringing the power tool to market, Stanley Black & Decker terminated the joint development agreement due to lack of resources to commit to the venture.  (ECF No. 75, PageID #1257 & #1380; ECF No. 76, PageID #1487.)

However, Cunningham suggested the concept of a "reverse licensing agreement" to assist Mr. Kundel in bringing his power tool to market.  (ECF No. 72, PageID #814; ECF No. 75, PageID #1245.)   Under this concept, rather than Mr. Kundel licensing his patent to Stanley Black & Decker, Stanley Black & Decker would license its affiliate brands to Mr. Kundel.  (ECF No. 75, PageID #1231.)

On March 23, 2016, Mr. Kundel, through Wellington Corp, entered into a reverse licensing agreement with Stanley Black & Decker.  (ECF No. 74-5, PageID #1157–85; ECF No. 76, PageID #1534–35.)  The agreement permitted Mr. Kundel to sell, distribute, and advertise his power tool under Stanley Black & Decker's affiliate brands, Porter-Cable and Black & Decker.  (ECF No. 74-1, PageID #1087; ECF No. 74-5, PageID #1157–85; ECF No. 76, PageID #1534–35.)   As part of the agreement, Mr. Kundel was not permitted to develop or sell his power tool bearing competitive third-party brands, which included the Craftsman brand.  (ECF No. 72,

3

PageID #726; ECF No. 74-5, PageID #1161 & #1189.)  The license agreement terminated on December 31, 2018.  (ECF No. 72, PageID #727; ECF No. 74-5, PageID #1175.)

During the course of the license agreement, the Black & Decker branded power tool never gained traction in sales.  (ECF No. 72, PageID #733–41.)  It was only sold online, not in retail stores.  (*Id.*, PageID #735.)  Ultimately, only 450 Black & Decker branded units were sold, yielding total revenue of approximately $25,000.  (*Id.*, PageID #740.)

After the termination of the initial reverse licensing agreement, Mr. Kundel, through Wellington Corp, extended the license agreement for the Porter-Cable brand for one additional year, starting January 1, 2019.  (*Id.*, PageID #729; ECF No. 74-1, PageID #1087; ECF No. 77, PageID #1874.)  The license renewal agreement did not include a license for the Black & Decker brand.  (ECF No. 72, PageID #729–30; ECF No. 74-1, PageID #1087.)

### A.2. Lowe's

Shortly after entering into the reverse licensing agreement for Stanley Black & Decker's affiliate brands, Mr. Kundel, through Wellington Corp, executed a buying agreement with Lowe's Companies, Inc.  (ECF No. 72, PageID #719.)  Under the buying agreement, Lowe's purchased over thirteen thousand units of the Porter-Cable branded power tool for $1.4 million.  (*Id.*, PageID #719–20.)  This purchase was a test run.  (*Id.*, PageID #720–21.)  It took over a year to sell the inventory Lowe's

had purchased, partially due to a lack of exposure of the product in stores. (ECF No. 71, PageID #72.)

Around this time, Stanley Black & Decker purchased the Craftsman brand. (ECF No. 76, PageID #1601.) Based on an agreement it reached with Stanley Black & Decker, Lowe's transitioned to selling the Craftsman brand and began to phase out the Porter-Cable brand. (ECF No. 71, PageID #724; ECF No. 76, PageID #1601 & #1603; ECF No. 77, PageID #1872.) Lowe's suggested that Mr. Kundel transition his power tool from the Porter-Cable brand to the Craftsman brand so that he could continue to sell it at Lowe's. (ECF No. 72, PageID #1601.)

During the transition between brands, Mr. Kundel continued to sell the Porter-Cable branded power tool to Lowe's. (ECF No. 72, PageID #729.) To facilitate sales during the transition, Mr. Kundel extended his reverse license agreement with Stanley Black & Decker for the Porter-Cable brand for an additional year. (*Id.*; ECF No. 74-1, PageID #1087; ECF No. 77, PageID #1874.) Mr. Kundel also entered into a license agreement with Stanley Black & Decker for the Craftsman brand in October 2018 and planned to launch the Craftsman-branded power tool at Lowe's in October 2019. (ECF No. 72, PageID #744.)

### B. Mr. Kundel's Relationship with Matthew Gennari

After Stanley Black & Decker cancelled the joint development agreement, Cunningham connected Mr. Kundel with Matthew Gennari. (ECF No. 75, PageID #1299; ECF No. 77, PageID #1768.)

5

### B.1.    Matthew Gennari and Gennari Consulting

Mr. Gennari is a former employee of and coworker of Cunningham's at Stanley Black & Decker.  (ECF No. 75, PageID #1268; ECF No. 77, PageID #1767.)  After leaving the employment of Stanley Black & Decker, Mr. Gennari associated with the Chinese company Jinding.  (ECF No. 78, PageID #1956.)  To work with Jinding, Mr. Gennari formed Gennari Consulting.  (*Id.*, PageID #1956.)  Gennari Consulting entered into an employment agreement with Jinding, starting in July 2010.  (ECF No. 77, PageID #1808 & #1834.)

### B.2.    Mr. Gennari's Role Bringing the Power Tool to Market

After Cunningham's introduction, Mr. Kundel began to work with Mr. Gennari to bring his power tool to market.  Mr. Gennari presented the power tool to Jinding, which agreed to help bring it to market.  (ECF No. 72, PageID #674; ECF No. 77, PageID #1769.)  Jinding produced a working model of the power tool for Mr. Kundel to present to buyers.  (ECF No. 72, PageID #677–78.)  Mr. Gennari facilitated the communication between Mr. Kundel and Jinding.  (*Id.*, PageID #679.)

On April 3, 2015, Mr. Kundel, through Wellington Corp, entered into a joint collaboration agreement with Jinding to produce the power tool.  (*Id.*, PageID #681; ECF No. 74-4, PageID #1133–35.)  Mr. Gennari prepared the agreement on behalf of Jinding.  (ECF No. 72, PageID #681; ECF No. 77, PageID #1845.)  The agreement granted Jinding the right to sell the power tool outside the United States by paying a royalty to Wellington Corp.  (ECF No. 72, PageID #686; ECF No. 74-4, PageID #1133.)

During this time, Mr. Gennari worked with Cunningham at Stanley Black & Decker on developing a reverse licensing agreement so that the power tool could be sold under Stanley Black & Decker's affiliate brands.  (ECF No. 77, PageID #1770.) After Wellington Corp entered into the reverse licensing agreement with Stanley Black & Decker, Mr. Gennari worked to secure the buying agreement with Lowe's by meeting with and leveraging his relationships with Lowe's executives.  (ECF No. 72, PageID #737; ECF No. 77, PageID #1770–71.)

### B.3.   Gross Profit Distribution Agreement

On August 12, 2016, Mr. Kundel, through Wellington Corp, and Mr. Gennari, through Gennari Consulting, entered into a one-page gross profit distribution agreement.  (ECF No. 69-2, PageID #619; ECF No. 72, PageID #697.)  Mr. Kundel maintains that Mr. Gennari prepared the agreement (ECF No. 72, PageID #701), while Mr. Gennari maintains that the two drafted it together and that Mr. Kundel drafted a good portion of it.  (ECF No. 78, PageID #2014.)

The profit distribution agreement provides that gross profit generated from the sale of licensed products sold through Wellington Corp would be split 65% to Wellington Corp and 35% to Gennari Consulting.  (ECF No. 69-2, PageID #619.)  The agreement provides that both parties bear their own costs, with the exception of mutually agreed on significant investments, which the parties agreed to split in the same proportion as the gross profit split.  (*Id.*)  The agreement ties its term to the licensing agreement with Stanley Black & Decker.  It provides:

> Gross profit Distribution Agreement between Wellington Corp LLC CEO Robert Kundel Jr. and Gennari Consulting Inc. CEO Matthew

7

Gennari effective 7.24.16 and remains in effect throughout the licensing agreement with [Stanley Black & Decker] for the Porter-Cable and Black+Decker brands providing that Matthew Gennari is openly and actively managing those above mentioned accounts.

(*Id.*)

### B.4.  Termination of the Relationship

On May 10, 2019, by email, Mr. Kundel terminated the agreement between Wellington Corp and Gennari Consulting.  (ECF No. 69-3, PageID #621; ECF No. 72, PageID #823.)   In the email, Mr. Kundel informed Mr. Gennari that he would continue to work directly with Jinding.  (ECF No. 69-3, PageID #621.)  Separately, Mr. Kundel informed Jinding and Lowe's that he was no longer working with Mr. Gennari.  (ECF No. 72, PageID #833–34.)  After Mr. Kundel's termination of the agreement between Wellington Corp and Gennari Consuting, Jinding cut off all communication with Mr. Gennari and ceased working with him.  (ECF No. 77, PageID #1835.)

On May 27, 2019, Mr. Gennari emailed Lowe's executives regarding the termination of his business relationship with Mr. Kundel.  (ECF No. 6, PageID #55.) Mr. Gennari wrote that he had made a "number of commitments" to Lowe's about the launch of the Craftsman-branded power tool based on the understanding that Mr. Gennari would be "the one to execute the plan." (*Id.*)  Given these commitments, Mr. Gennari wrote that he "felt the onerous obligation to tell you that this is in significant question" and that there was "risk for the [Craftsman] transition plan that [he] committed to." (*Id.*)

On May 29, 2019, counsel for Mr. Gennari sent a letter to Advanced Bonded Warehousing, which housed the power tool inventory.  (ECF No. 6, PageID #57.)  The letter communicates Mr. Gennari's position that Gennari Consulting partly owned the inventory.  (*Id.*)  Further, the letter instructs Advanced Bonded to hold the inventory in its possession until the parties or a court determine how to apportion it. (*Id.*)

## STATEMENT OF THE CASE

Based on these facts, Plaintiff Wellington Corp filed suit in State court against Defendants Gennari Consulting and its sole shareholder Matthew Gennari.  (ECF No. 6.)  Plaintiff asserts two claims.  First, Plaintiff asserts a claim for breach of contract against Gennari Consulting.  (*Id.*, ¶¶ 31–34, PageID #41.) Specifically, Plaintiff alleges that Gennari Consulting breached the Gross Profit Distribution Agreement.  (*Id.*)  Second, Plaintiff asserts a claim for tortious interference with business and contractual relationships against Gennari Consulting and Mr. Gennari. (*Id.,* ¶¶ 35–37, PageID #42.)  In addition to damages, Plaintiff seeks injunctive relief. (*Id.*, ¶¶38–41, PageID #42–43.) The Gennari Defendants timely removed to federal court based on diversity jurisdiction.  (ECF No. 1, PageID #1.)

The Gennari Defendants answered the complaint. (ECF No. 33.)  Further, Defendant Gennari Consulting filed counterclaims against Wellington Corp and a third-party complaint against Wellington Corp's founder, Mr. Kundel.  (ECF No. 69.) Against Wellington Corp, Defendant asserts counterclaims for breach of contract and unjust enrichment.  (*Id.*, ¶¶ 32–47, PageID #608–13.)  Against both Wellington Corp

and Mr. Kundel, Defendant asserts a claim for conversion and civil theft.  (*Id.*, ¶¶ 55–59,  PageID #613–14.)  The Gennari Defendants provided Wellington Corp and Mr. Kundel with an expert report on their affirmative claims.  (ECF No. 73, PageID #885; ECF No. 79-4, PageID #2155–66.)  Wellington Corp and Mr. Kundel did not provide an expert report.  (ECF No. 73, PageID #885; ECF No. 80, PageID #2197.)

Before the Court are cross motions for summary judgment.  The Gennari Defendants move for summary judgment on Plaintiff's claims for breach of contract and tortious interference.  (ECF No. 73.)  Wellington Corp and Mr. Kundel move for summary judgment on Defendant Gennari Consulting's counterclaims and third-party complaint.  (ECF No. 74.)

## ANALYSIS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  On a motion for summary judgment, the Court must view evidence in the light most favorable to the non-moving party.  *Kirilenko-Ison v. Board of Educ. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

The moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the claim or defense at issue.  *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 & n.12 (6th Cir. 1989); *Chappell v. City of Cleveland*, 584 F. Supp. 2d 974, 988 (N.D. Ohio 2008).  After

10

discovery, summary judgment is appropriate if the nonmoving party fails to establish "an element essential to that party's case and upon which that party will bear the burden of proof at trial."  *Tokmenko v. MetroHealth Sys.*, 488 F. Supp. 3d 571, 576 (N.D. Ohio 2020) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

"The party seeking summary judgment has the initial burden of informing the court of the basis for its motion" and identifying the portions of the record "which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* (citing *Celotex Corp.*, 477 U.S. at 322).  Then, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial."  *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986)).  "When the moving party has carried its burden under Rule 56(c), its opponent must do more than show there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 586.

If a genuine dispute exists, meaning "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate.  *Id.*  However, if "the evidence is merely colorable or is not significantly probative," summary judgment for the movant is proper.  *Id.*  The "mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson*, 477 U.S. at 247–48).  To determine whether a genuine dispute about material facts exists, it is not the Court's duty to search the record; instead, the parties must bring those facts to the Court's attention.  *See Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996).  Ultimately, the Court must determine

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251.

## I. The Gennari Defendants' Motion for Summary Judgment

The Gennari Defendants move for summary judgment on Plaintiff Wellington Corp's claims for breach of contract and tortious interference. (ECF No. 73.)

### I.A. Breach of Contract

Under Ohio law. "[t]o establish a claim for breach of contract, a plaintiff must prove: (1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig. v. Fifth Third Bank*, 925 F.3d 265, 276 (6th Cir. 2019) (citing *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, 104 N.E.3d 1076, ¶ 28 (Ohio Ct. App.)). "[S]ummary judgment may be granted to the defendant in a breach-of-contract case where the plaintiff has failed to provide evidence of economic damages resulting from a breach of contract and has failed to seek injunctive relief or specific performance of a contractual duty." *Princeton Radiology Assocs., PA v. Advocate Radiology Billing & Reimbursement Specialists, LLC*, No. 2:19-CV-2311, 2022 WL 501205, at *3 (S.D. Ohio Jan. 3, 2022) (quoting *DeCastro v. Wellston City Sch. Dist. Bd. of Educ.*, 94 Ohio St. 3d 197, 201, 2002-Ohio-478, 761 N.E.2d 612 (2002)).

Here, Plaintiff seeks injunctive relief against the Gennari Defendants. (ECF No. 6, PageID #42–43.) However, the injunctive relief sought relates solely to

Plaintiff's claim for tortious interference.  Since Plaintiff does not seek specific performance of any contractual duty, the analysis turns on whether Plaintiff has provided sufficient evidence from which a reasonable jury could find that Defendants' alleged breach of contract caused Plaintiff any economic damages.

### I.A.1.  Lost Profits

Under Ohio law, a plaintiff may recover both actual and consequential damages, such as lost future profits.  *Telxon Corp. v. Smart Media of Del., Inc.*, Nos. 22098, 22099, 2005-Ohio-4931, ¶ 103 (Ohio Ct. App.).  Based on the nature of the agreement, which provides only for the relative distribution of profits, Defendants maintain that any damages arising from the alleged breach must be based on actual profits lost.  (ECF No. 73, PageID #888.)

Generally, a prevailing party may recover lost profits for a breach of contract where (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.  *Matco Tools Corp. v. Urquhart*, 435 F. Supp. 3d 802, 813 (N.D. Ohio 2020) (citations omitted).  Defendants acknowledge that the parties contemplated profits when they entered into the contract and that any loss of profits is the probable result of the breach of contract.  (ECF No. 73, PageID #889.)  Defendants dispute the third prong, arguing that Plaintiff's claim fails because any lost profits are speculative. (ECF No. 73, PageID #889.)

To recover lost profits, the amount of the profits, in addition to their existence, must be demonstrated with reasonable certainty.  *Matco Tools*, 435 F. Supp. 3d at 813 (citing *Rhodes v. Rhodes Indus., Inc.*, 71 Ohio App. 3d 797, 595 N.E.2d 441, 448 (1991)).  If lost profits are not "substantiated by calculations based on facts available or in evidence," then they are speculative and uncertain.  *Id.*

Under this governing standard, the Court reviews the evidence on damages for lost profit that Plaintiff presents on summary judgment.  On the Court's order, Wellington Corp made a written demand to the Gennari Defendants.  (ECF No. 72, PageID #741–72; ECF No. 73-2, PageID #905.)  In the demand, Wellington Corp stated: "Losing Black+Decker brand contract on [power tool] due to Defendant's lack of promotion, sales and distribution and failure to actively manage the accounts pursuant to the Gross Profits Distribution Agreement.  $1.5 to $2.0 million annual sales reduced by the cost of producing those lost sales." (ECF No. 72, PageID #742; ECF No. 73-2, PageID #905.)

To calculate these figures, Mr. Kundel relied on the initial launch of the Porter-Cable branded power tool to Lowe's, which generated $1.4 million.  (ECF No. 72, PageID #742.)  Mr. Kundel did not have an agreement with Lowe's for the Black & Decker branded power tool.  (*Id.*, PageID #743.)  Rather, Mr. Kundel reasoned that the Black & Decker branded power tool had potential and could have had a similarly valued launch into a store.  (*Id.*)  For instance, Mr. Kundel believed he could have gotten the Black & Decker branded power tool into Wal-Mart.  (*Id.*, PageID #745–46.)  When Wellington Corp's license for the Black & Decker brand terminated, Wellington

14

Corp's sales for the Black & Decker branded power tool totaled approximately $25,000. (*Id.*, PageID #745.)

Other than the purchase orders related to the initial launch at Lowe's, Plaintiff has no documentation to support the $1.5 to $2 million figure for lost sales. (*Id.*, PageID #744.) Plaintiff has not provided an expert report on damages; nor has he identified any expert who will opine on the issue of damages. (ECF No. 73, PageID #891; *see* ECF No. 80, PageID #2199–2202.) Although the Lowe's purchase might provide a reasonable benchmark, Plaintiff provides no reason to think comparable revenue might be reasonably certain. Further, Plaintiff provides no information about the "costs of producing those lost sales," leaving unspecified by how much the $1.5 to $2 million gross figure must be reduced to reflect accurately lost profits and not just top-line revenue.

Plaintiff argues that it is not required to reveal its theory of damages. (ECF No. 80, PageID #2200.) And Plaintiff counters that it has produced all documents, including financial records, necessary to determine damages and that Mr. Kundel will testify at trial based on his personal knowledge to explain that damages are easily calculable. (*Id.* PageID #2200–01 & n.5.) This argument mistakes the meaning of documents that might support a request for damages in closing argument for evidence that those damages, in any amount, are reasonably certain. On this score, Plaintiff comes forward with no evidence making such a showing.

Plaintiff maintains that it will prove its damages at trial through Mr. Kundel's testimony. (*Id.*, PageID #2202.) In support of this position, Plaintiff relies on cases

15

where a plaintiff proves all the elements of a claim for breach of contract claim but cannot prove damages, leading to a finding of breach at trial but no damages. (*Id.*, PageID #2202 n.6.)  However, a plaintiff must prove damages, like all other elements of a claim, by a preponderance of the evidence. *Eggert v. Meritain Health, Inc.*, 428 F. App'x 558, 563 (6th Cir. 2011).  Accordingly, for the breach of contract claim to survive summary judgment, Plaintiff must show there is a genuine dispute of material fact about damages.

The Gennari Defendants argue that, on its face, Plaintiff's claim for damages for lost profits in the range of $1.5 to $2 million is not reasonably certain.  (ECF No. 81, PageID #2212.)  Defendants point out that there was no pending transaction for the Black & Decker branded power tool.  (*Id.*)  Further, they argue that many factors would have affected any potential sale and differentiated it from the Lowe's launch of the Porter-Cable branded power tool, including any potential customer's capabilities, intentions, market, and consumer base.  (*Id.*)  Finally, Defendants point out that Plaintiff's calculation is imprecise because it includes a large range of $500,000.  (ECF No. 73, PageID #890–91.)

Based on the evidence presented, and construing it in Plaintiff's favor, the Court determines that Plaintiff has not carried its burden at the summary judgment stage to show there is a genuine dispute of material fact issue about damages for lost profits.  Demonstrating lost profits to a reasonable certainty requires the use of "detailed evidence" that is "sufficient to support calculations establishing the amount of lost profits." *Ask Chemicals, LP v. Computer Packages, Inc.*, 593 F. App'x 506, 511

16

(6th Cir. 2014).  Although Mr. Kundel's testimony will allow a jury to find an amount of lost profits, this evidence does not support a finding regarding the amount of profit lost to the requisite certainty.  Nor has Plaintiff produced any document or witness establishing to a sufficient degree of certainty that the Gennari Defendants' breach resulted in lost profits.

Plaintiff's only record of sales of the Black & Decker branded power tool is for approximately $25,000.  To support its calculation, Plaintiff points to only one sale, to Lowe's, of the Porter-Cable brand power tool, without any further analysis of how the Porter-Cable branded power tool differed from the Black & Decker or of how Lowe's differed from any potential customers for the Black & Decker branded power tool.  Without more, there is no way to calculate lost profit damages with reasonable certainty because the record provides no reasonable or reliable estimation of the number of units, if any, of the Black & Decker branded power tool Plaintiff could have sold.

To oppose summary judgment, Plaintiff cannot simply stand on its pleadings or rely on the promise that a witness will provide evidence at trial.  Contrary to Defendants' argument, an expert is not strictly necessary.  And to some degree proof of lost damages is necessarily hypothetical or speculative.  *Horter Inv. Mgmt., LLC v. Cutter*, 257 F. Supp. 3d 892, 920 (S.D. Ohio 2017) (discussing *Ask Chemicals*, 593 F. App'x at 514 (Clay, J., concurring)).  In this case, however, Plaintiff has simply failed to come forward with any evidence that the lost profits it claims, somewhat uncertain or speculative though they might necessarily be, are reasonably certain to occur.

17

Because Plaintiff has not met its burden, there is no genuine dispute of fact on the issue of damages for lost profits for a jury to try.

### I.A.2.  Direct Damages

Plaintiff does not base its damages solely on a theory of lost profits.  As an example of easily calculable damages, Plaintiff argues that Mr. Gennari made unapproved changes to the design of the power tool that resulted in Wellington Corp having to pay for inventory that was unsellable.  (ECF No. 80, PageID #2200 n.4; *see* ECF No. 72, PageID #852–54.)   Based on this conduct, Plaintiff argues that Wellington Corp has sustained damage at least in the amount of the unsellable inventory for which it paid.  (ECF No. 80, PageID #2200 n.4.)  In Plaintiff's demand to Defendants, Plaintiff alleged several other instances of damages arising from the Gennari Defendants' unapproved and unilateral changes to the power tool and mismanagement of inventory.  (ECF No. 73-2, PageID #905–06.)

Defendants argue that Plaintiff has produced no documentation to support any economic loss sustained.  (ECF No. 73, PageID #893.)  Specifically, Defendants respond to and refute each of Plaintiff's claimed losses for damaged or unsellable inventory, with citations to evidence in the record.  (*Id.*, PageID #893–901.)  In response, Plaintiff fails to address Defendants' arguments related to direct damages and fails to identify with specificity any evidence contrary to their position.  (*See generally* ECF No. 80.)

Again, on summary judgment, Plaintiff may not rely on the pleadings and has an obligation to come forward with evidence showing that there is an issue for trial.

Based on the Gennari Defendants' detailed review of the record, the Court concludes that no reasonable jury can find in Plaintiff's favor on this theory of damages either.

*    *    *

For these reasons, the Court determines that there is no genuine issue for trial about damages, either based on a theory of lost profits or direct damages.  Because Plaintiff has failed to demonstrate an essential element of its breach of contract claim, the Gennari Defendants are entitled to judgment as a matter of law.

### I.B.  Tortious Interference

The Gennari Defendants move for summary judgment on Plaintiff's tortious interference claim.  Plaintiff alleges that Defendants tortiously interfered with its business and contractual relationships by sabotaging Plaintiff's business and delaying the delivery of Plaintiff's products from the warehouse.  (ECF No. 6, ¶ 36, PageID #42.)

To establish tortious interference with contract under Ohio law, a plaintiff must show:  "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages."  *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 817 (6th Cir. 2008) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 85 Ohio St. 3d 171, 176, 1999-Ohio-260, 707 N.E.2d 853 (1999)).  Tortious interference with a business relationship has similar elements but occurs where the improper interference induces or otherwise purposely causes a third party not to enter into or continue a business relationship with the plaintiff.  *Havensure, LLC v. Prudential*

*Ins. Co. of Am.*, 595 F.3d 312, 315 (6th Cir. 2010) (citing *A & B-Abell Elevator Co. v. Columbus/Central Ohio Bldg. & Constr. Trades Council*, 73 Ohio St. 3d 1, 14, 1995-Ohio-66, 651 N.E.2d 1283 (1995)).

Based on the same arguments related to direct damages discussed above, Defendants argue that Plaintiff's tortious interference claim fails because Plaintiff has not shown the essential element of the alleged damages.  (ECF No. 73, PageID #891.)  Plaintiff made a demand for damages related to the Gennari Defendants' allegedly unapproved changes to the power tool and mismanagement of inventory. (ECF No. 73-2, ¶¶ 2–5, PageID #905–06.)  As discussed above, Defendants specifically address and refute each of these demands and Plaintiff makes no argument and presents no evidence in opposition.  Accordingly, for the same reasons, the Court determines that Plaintiff has not shown that there is a genuine dispute of material fact about these alleged damages that suffices to sustain Plaintiff's claim for tortious interference at the summary judgment stage.

However, Plaintiff made an additional demand for damages arising from its claim for tortious interference with a business relationship.  In its demand, Plaintiff claimed damages based on: "Threatened launch with Lowes.  Lowe's only issued PO's for $467,022 in Craftsman [branded power tool] launch compared to $1.4 million prior launch in 2016 with Porter-Cable [branded power tool].  Launch loss of $932,978 due to actions of Defendants." (ECF No. 73-2, ¶ 6, PageID #906.)  The threat to the launch at Lowe's refers to the May 27, 2019 email Mr. Gennari sent to Lowe's executives regarding the termination of his business relationship with Mr. Kundel and

Wellington Corp.  (ECF No. 6, PageID #55; ECF No. 72, PageID #870.)  At the time Mr. Gennari sent the email, Lowe's had committed to purchasing 4,700 units of the Craftsman-branded power tool for the initial launch order, for approximately $467,000.  (ECF No. 72, PageID #870.)  After receiving the email, Lowe's did not change its order.  (*Id*.)

Though Defendants move for summary judgment on the tortious interference claim solely based on damages, they do not address the claimed damages from interference with Wellington Corp's business relationship with Lowe's beyond what they previously addressed regarding Plaintiff's claim for lost profits on the claim for breach of contract.  In response, Plaintiff makes no argument and points to no specific evidence supporting damages arising from interference with the launch at Lowe's. Indeed, the record shows that Lowe's did not change its order after the events of which Plaintiff complains.  (ECF No. 72, PageID #870.)  Therefore, the Court determines there is no genuine dispute of material fact relating to damages—either damages from unapproved changes and mismanagement or the damages from interference with the launch at Lowe's.  *See Byrne v. University Hosps.*, No. 95971, 2011-Ohio-4110, ¶ 30 (Ohio Ct. App.) (holding summary judgment on the tortious interference claim was appropriate where the plaintiff failed to introduce any evidence of damages).  Because Plaintiff has failed to show an essential element of its claim for tortious interference, the Gennari Defendants are entitled to judgment as a matter of law.

21

### I.C. Application for Injunctive Relief

In the complaint, Plaintiff applies for injunctive relief, which it styles as a third count. (ECF No. 6, ¶¶ 38–41, PageID #43.) Defendants do not move for summary judgment on this count. However, injunctive relief is a remedy, not a claim. *Madej v. Maiden*, 951 F.3d 364, 369 (6th Cir. 2020) (citing *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012)). Because Defendants are entitled to summary judgment on Plaintiff's causes of action, Plaintiff cannot obtain injunctive relief. Accordingly, Plaintiff's application for injunctive relief does not survive Defendants' motion for summary judgment.

## II. Wellington Corp's and Mr. Kundel's Motion for Summary Judgment

Wellington Corp and Mr. Kundel move for summary judgment on all of Gennari Consulting's claims against them. Against Wellington Corp, Gennari Consulting asserts counterclaims for breach of contract and unjust enrichment. Against both Wellington Corp and Mr. Kundel, Gennari Consulting asserts a claim for conversion and civil theft.

### II.A. Breach of Contract

To establish a claim for breach of contract, a plaintiff must prove: "(1) the existence of a contract, (2) performance by the plaintiff, (3) breach by the defendant, and (4) damages or loss resulting from the breach." *In re Fifth Third Early Access Cash Advance Litig.*, 925 F.3d at 276 (citing *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 2018-Ohio-2602, 104 N.E.3d 1076, ¶ 28 (Ohio Ct. App.)).

Gennari Consulting asserts a claim against Wellington Corp for breach of the gross profit distribution agreement.  (ECF No. 69, ¶¶ 32–42, PageID #608–12.) Among other things, Gennari Consulting alleges that Wellington Corp breached the profit distribution agreement by unilaterally and summarily terminating it without notice, cause, or merit.  (*Id.*, ¶ 40, PageID #610–11.)

Wellington Corp moves for summary judgment on this claim on two bases. First, it argues that it was justified in terminating the profit distribution agreement because Mr. Gennari failed to perform under the contract.  (ECF No. 74, PageID #1061–62.)  Second, Plaintiff argues that the profit distribution agreement, by its terms, would have terminated when the licensing agreements for the Porter-Cable and Black & Decker brands terminated.  (*Id.*, PageID #1062–64.)

### II.A.1.  Mr. Gennari's Performance

By its terms, the profit distribution agreement remained in effect only while Mr. Gennari provided "open[] and active[]" management.  (ECF No. 69-2, PageID #619.)  The counterclaim Defendants argue that Mr. Gennari failed to perform this management duty and that this failure justifies termination of the profit distribution agreement.  (ECF No. 74, PageID #1061–62.)

In support of its position that Mr. Gennari failed to perform his management duty, Wellington Corp advances three reasons.  First, it notes that Mr. Gennari acted deceptively by receiving compensation from Jinding in the form of salary and commissions related to the sale of the power tools in addition to receiving compensation under the profit distribution agreement.  (ECF No. 74, PageID #1061.)

23

But Wellington Corp does not explain how this conduct justifies unilateral termination of the agreement.  Under Ohio law, a contract procured by fraudulent inducement may be rescinded with clear and convincing evidence of fraud.  *Micrel, Inc. v. TRW, Inc.*, 486 F.3d 866, 873 (6th Cir. 2007).  However, Wellington Corp does not raise a claim for fraudulent inducement or argue that its elements are met such that they could justifiably rescind the agreement.  As to whether Mr. Gennari's allegedly duplicitous conduct constituted a material breach of the agreement that would justify termination, Wellington Corp points to no provision barring Mr. Gennari or Gennari Consulting from receiving other income related the sale of power tools.

Second, Wellington Corp argues that Mr. Gennari did little or nothing to bring the power tool to market, as evidenced by its lack of success.  (ECF No. 74, PageID #1061–62.)  The counterclaim Defendants dispute the assertion that Mr. Gennari did "little or nothing" to bring the power tool to market.  (ECF No. 79, PageID #2120–21.)  They point to evidence in the record showing Mr. Gennari's management efforts.  For instance, Cunningham testified that Mr. Gennari was actively involved in the process of presenting to Lowe's and instrumental to securing Lowe's business.  (ECF No. 75, PageID #1406.)  Also, they point to a list that Mr. Gennari provided to Mr. Kundel in 2017 showing the tasks that Mr. Gennari undertook related to the power tool, including product development, marketing, finance, supply chain management, sourcing, commercial execution and planning, and human resources.  (ECF No. 79, PageID #2120–21; ECF No. 79-5, PageID #2167–71.)  Finally, they object to

24

Wellington Corp's conflation of the power tool's lack of success with Mr. Gennari's lack of effort as logically fallacious, arguing that new inventions face many challenges in coming to market.  (ECF No. 79, PageID #2120.)

The phrase "openly and actively managing" is not defined in the agreement. Nor do other provisions within the agreement shed light on what duties or responsibilities constitute the management the parties intended Mr. Gennari to undertake.  Given the lack of definition and the evidence that Mr. Gennari performed at least some management, there is a genuine issue of material fact whether Mr. Gennari performed under the agreement.  Accordingly, there is also a genuine dispute of material fact whether Mr. Gennari's conduct justified unilateral termination of the agreement.

Third, Wellington Corp maintains that Mr. Gennari was involved in many other business ventures for other clients at the same time he had management duties under the profit distribution agreement.  (ECF No. 74 PageID #1062.)  But it does not explain why Mr. Gennari's concurrent work for other clients justifies termination of the agreement.  Nothing in the agreement precludes Mr. Gennari from pursuing other business ventures.  To the extent Wellington Corp argues that Mr. Gennari's other work prevented him from performing under the agreement, as discussed above, whether Mr. Gennari performed presents a dispute of fact.

### II.A.2.  Termination of the Brand Licensing Agreements

In addition, Wellington Corp argues that the profit distribution agreement would have terminated on its own terms at the end of 2019.  (ECF No. 74, PageID

#1063.)  For this argument, it relies on the phrase contained in the profit distribution agreement stating that the agreement "remains in effect throughout the licensing agreement with [Stanley Black & Decker] for the Porter-Cable and Black+Decker brands." (ECF No. 69-2, PageID #619; ECF No. 74, PageID #1063.)  On December 31, 2018, the initial license agreement for the Porter-Cable and Black & Decker brands terminated.  (ECF No. 72, PageID #727; ECF No. 74-5, PageID #1175.)  The renewal license agreement for the Porter-Cable brand terminated on December 31, 2019.  (ECF No. 72, PageID #729; ECF No. 74-1, PageID #1087; ECF No. 77, PageID #1874.)  Because the licensing agreements for both the Porter-Cable and Black & Decker brands terminated by the end of 2019, Wellington Corp contends that the profit distribution agreement also would have terminated at the end of 2019.  (ECF No. 74, PageID #1063.)

Wellington Corp does not contest that Mr. Kundel terminated the profit distribution in May 2019, approximately seven months before the agreement would have terminated by its terms.  (*Id.*, PageID #1064.)  Whether the agreement was of a defined or open duration might be relevant to the calculation of damages resulting from a breach.  However, when the contract would have terminated is not relevant to whether its early termination constitutes a breach.  Accordingly, the question remains whether Wellington Corp's termination was justified.  As already discussed, that question presents a genuine issue of material fact.

\*     \*     \*

The Court determines that there is a genuine issue of material fact whether Wellington Corp was justified in unilaterally terminating the gross profit distribution agreement in May 2019.  Moreover, the unilateral termination is only one subset of the Gennari Defendants claim for breach of contract.  They also allege that Wellington Corp failed to perform its duties and responsibilities under the profit distribution agreement, failed to act in good faith and fair dealing, and failed to pay Gennari Consulting its share of the profits and of the inventory.  (ECF No. 69, ¶ 40, PageID #610–11.)  Accordingly, summary judgment is not appropriate on this claim.

### II.B.  Unjust Enrichment

Wellington Corp also moves for summary judgment on Defendant Gennari Consulting's counterclaim for unjust enrichment.  (ECF No. 69, ¶¶ 43–47, PageID #612–13; ECF No. 74, PageID #1064–65.)  In support of its unjust enrichment counterclaim, Gennari Consulting maintains that it conferred on Wellington Corp the benefit of "providing business contacts, customers, vendors, manufacturers, knowledge, training and industry expertise, along with the methodology, means and data to engage in competitive conduct, including access to data and information for numerous manufacturers, customer and prospects."  (ECF No. 69, ¶ 44, PageID #612.)  Also, it claims that Gennari Consulting conferred the benefit of "revising, developing and otherwise improving the [power tool] product to make it saleable, usable, safe, and efficient."  (*Id.*, ¶ 45, PageID #613.)

To prevail on an unjust enrichment claim under Ohio law, a plaintiff must show:  "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the

27

defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment." *Cook v. Ohio Nat'l Life Ins. Co.*, 961 F.3d 850, 858 (6th Cir. 2020) (quoting *Hambleton v. R.G. Barry Corp.*, 12 Ohio St. 3d 179, 465 N.E.2d 1298, 1302 (1984)).

"Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another." *Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir. 2009) (quoting *Beatley v. Beatley,* 160 Ohio App. 3d 600, 2005-Ohio-1846, 828 N.E.2d 180, ¶ 61 (2005)) (emphasis omitted). "[A] plaintiff may not recover under the theory of unjust enrichment or quasi-contract when an express contract covers the same subject." *Cook*, 961 F.3d at 858 (quoting *Lehmkuhl v. ECR Corp.*, No. 06-CA-039, 2008-Ohio-6295, ¶ 55 (Ohio Ct. App. Dec. 2, 2008)).

Wellington Corp argues that Gennari Consulting is barred from raising an unjust enrichment claim because the gross profit distribution agreement covers the same subject giving rise to the claim. (ECF No. 74, PageID #1065.) In response, Gennari Consulting makes two arguments. (ECF No. 79, PageID #2124–25.)

### II.B.1. Craftsman-Branded Power Tool

Gennari Consulting argues that its work to promote and sell the Craftsman-branded power tool unjustly enriched Wellington Corp. (ECF No. 79, PageID #2124.) As an initial matter, the parties dispute whether the gross profit distribution agreement covers services related to the Craftsman-branded power tool. Wellington

28

Corp maintains that they are.  (ECF No. 79, PageID #2121–23.)  If so, damages relating to Mr. Gennari's services in this area would fall under the breach of contract claim.  Since Gennari Consulting maintains that the Craftsman-branded power tool is not covered by the gross profit distribution agreement (ECF No. 82, PageID #2220–21), it raises an unjust enrichment claim based on performance of these services in the alternative.  Accordingly, the threshold question for this claim is whether the gross profit distribution agreement covers services related to the Craftsman-branded power tool.

The parties agree that, on its face, the profit distribution agreement does not extend to the Craftsman brand.  (ECF No. 79, PageID #2122–23; ECF No. 82, PageID #2223.)  Rather, the agreement is tied to the duration of the licenses only for the Porter-Cable and Black & Decker brands.    (ECF No. 69-2, PageID #619.)  Nonetheless, Gennari Consulting argues that the parties modified the profit distribution agreement to include the Craftsman brand by their conduct.  (ECF No. 79, PageID #2123.)  When the parties entered the profit distribution agreement, Craftsman was a competitor of Stanley Black & Decker, and the license agreement barred Wellington Corp from selling the power tool under the Craftsman brand. Later, Stanley Black & Decker acquired the Craftsman brand.  As evidence of modification of the profit distribution agreement, Gennari Consulting points to Mr. Gennari's negotiations with Stanley Black & Decker to license the Craftsman brand and with Lowe's for a new purchase agreement for the Craftsman-branded power tool.  (ECF No. 78, PageID #2021; ECF No. 79, PageID #2122.)  Gennari

Consulting does not argue and points to no evidence to show that Wellington Corp ever distributed to Gennari Consulting gross profits from the sale of the Craftsman-branded power tool.

In reply, Wellington Corp argues that Gennari Consulting has shown no evidence of mutual modification.  (ECF No. 82, PageID #2220.)  Instead, Wellington Corp argues, Gennari Consulting only presents evidence that Mr. Gennari performed work to sell the Craftsman-branded power tool.  (*Id.*)  Wellington Corp points out that Mr. Gennari was compensated for that work through his salary and commissions received through Jinding and that the work does not show that both parties to the profit distribution agreement considered it modified or amended to include an additional brand.  (*Id.*, PageID #2220–21 & #2221 n.3.)

In support of its position, Gennari Consulting relies on a line of Ohio cases holding that subsequent acts and agreements may modify the terms of a contract. *See, e.g.*, *Corsaro v. Arc Westlake Village, Inc.,* No. 84858, 2005-Ohio-1982, ¶ 16 (Ohio Ct. App.); *Smaldino v. Larsick,* 90 Ohio App. 3d 691, 698, 630 N.E.2d 408 (Ohio Ct. App. 1993); *Software Clearing House, Inc. v. Intrak, Inc.*, 66 Ohio App. 3d 163, 172, 583 N.E.2d 1056 (Ohio Ct. App. 1990).  Under this line of cases, a "modification may also be implied by the subsequent acts of the parties that demonstrate a meeting of the minds in agreement to modify its terms on any particular point." *Ashwell v. Director, Ohio Dep't of Job & Fam. Servs.*, No. 20522, 2005-Ohio-1928, ¶ 49 (Ohio Ct. App.).

30

None of these authorities supports the argument that Mr. Gennari's unilateral subsequent acts to promote the Craftsman-branded power tool constitutes a modification of the parties' profit distribution agreement.  Such a modification requires mutual action demonstrating a meeting of the minds.  "[A] contract cannot be unilaterally modified; the parties must mutually consent to the modification." *Ludwig v. Lydick*, No. 10 MO 9, 2011-Ohio-5164, ¶ 19 (Ohio Ct. App.).  Without more, Gennari Consulting has not shown a meeting of the minds between Mr. Gennari and Mr. Kundel to modify the terms of the agreement to include the Craftsman brand.

Accordingly, the Court determines that the gross profit distribution agreement does not extend to sales of the Craftsman-branded power tool.  Having reached this determination, the Court turns to Gennari Consulting's claim for unjust enrichment based on the Mr. Gennari's promotion of the Craftsman-branded power tool.  Because Mr. Gennari's efforts in this area were not covered by the profit distribution agreement, the agreement does not bar the claim for unjust enrichment.

Regarding the elements of an unjust enrichment claim, Wellington Corp does not dispute that Mr. Gennari conferred a benefit by working to advance the Craftsman-branded power tool or that it knew of the benefit.  Focusing on the third element, Wellington Corp argues that retention of the benefit would not be unjust because Mr. Gennari was compensated for his work through his employment with Jinding.  (ECF No. 82, PageID #2223.)  In the alternative, Wellington Corp asserts that the same arguments that apply to the breach of contract claim, relating to the

31

justifications for terminating the business relationship with the Gennari Defendants, also apply to the unjust enrichment claim. (ECF No. 74, PageID #1065.)

For the reasons discussed above, Wellington Corp's justifications relating to the termination present a genuine issue of material fact. Similarly, whether it would be unjust for Wellington Corp to retain the benefit conferred by Mr. Gennari's labor on the Craftsman-branded power tool or whether Mr. Gennari was sufficiently compensated by his employment with Jinding presents an issue for trial.

## II.B.2.  Gennari Consulting's Monetary Contribution

In addition to its argument related to Mr. Gennari's work on the Craftsman-branded power tool, Gennari Consulting asserts an unjust enrichment claim based on Gennari Consulting's monetary contributions to inventory. (ECF No. 79, PageID #2125.)  It asserts that Wellington Corp has property belonging to Gennari Consulting in its custody. (*Id.*) Wellington Corp does not respond to this claim.

Under the gross profit distribution agreement, Gennari Consulting and Wellington Corp each paid the general expenses that they incurred, and these expenses did not affect the gross profit distribution. (ECF No. 69-2, PageID #619.) However, the parties agreed that significant investment, resources, or expenses beyond general operating expenses for each entity, when mutually agreed on, would be deducted proportionately from each entity's gross profit. (*Id.*) The agreement does not address the purchase of inventory.

In the absence of a specific written term of the agreement covering inventory, and without argument to the contrary, the Court determines that the agreement does

32

not bar Gennari Consulting's claim for unjust enrichment based on Wellington Corp's withholding of inventory that Gennari Consulting purchased.

*     *     *

Because the two bases on which Gennari Consulting brings its unjust enrichment claim are not the same subject covered by the gross profit distribution agreement, the agreement between the parties does not bar the claim. Further, the Court determines that there is a genuine dispute of material fact whether Mr. Gennari's labor and Gennari Consulting's monetary contributions unjustly enriched Wellington Corp. Accordingly, summary judgment is not appropriate on this claim.

### II.C.  Conversion and Civil Theft

Finally, Wellington Corp and Mr. Kundel move for summary judgment on Gennari Consulting's conversion and civil theft claim. (ECF No. 74, PageID #1066.) Conversion is the "wrongful exercise of dominion or control over property belonging to another, in denial of or under a claim inconsistent with his rights." *Wiggins v. Bank of Am., N. Am.*, 488 F. Supp. 3d 611, 639 (S.D. Ohio 2020) (quoting *Bench Billboard Co. v. Columbus*, 63 Ohio App. 3d 421, 579 N.E.2d 240 (1989)). To establish a conversion claim, a plaintiff must show:  "(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Id.* (quoting *Dice v. White Family Cos.*, 173 Ohio App. 3d 472, 878 N.E.2d 1105 (2007)). Gennari Consulting claims that it has ownership rights to certain funds and

inventory arising from the gross profit distribution agreement.  (ECF No. 69, ¶ 56, PageID #614.)

### II.C.1.  Inventory

Gennari Consulting argues that Wellington Corp and Mr. Kundel converted its inventory by withholding and selling the property.  (ECF No. 79, PageID #2126.)  In support of its claim, Gennari Consulting points to evidence in the record that Mr. Kundel acknowledged and "quarantined" inventory that Gennari Consulting owned but then continued to sell the inventory.  (ECF No. 72, PageID #827–30; ECF No. 73, PageID #900–01; ECF No. 73-7, PageID #1021; ECF No. 73-9, PageID #1026–29; ECF No. 79, PageID #2126.)

A plaintiff may state a claim for conversion based on the unlawful retention of plaintiff's property if (1) the plaintiff demanded the return of the property from the defendant after the defendant exerted dominion or control over the property, and (2) the defendant refused to return the property to the plaintiff.  *Integrated Design Eng'g & Analysis Servs., Inc. v. Giddy Holdings, Inc.*, No. 5:20-CV-00563, 2021 WL 848949, at *5 (N.D. Ohio Mar. 5, 2021) (citing *Dice*, 173 Ohio App. 3d 472, 2007-Ohio-5755, 878 N.E.2d 1105, ¶ 17 (Ohio Ct. App.)).  However, the existence of a contract action excludes the opportunity to present the same case as a tort claim.  *Toledo Mack Sales & Serv., Inc. v. Mack Trucks, Inc.*, 437 F. App'x 381, 385 (6th Cir. 2011) (citing *Textron Fin. Corp. v. Nationwide Mut. Ins. Co.,* 115 Ohio App. 3d 137, 151, 684 N.E.2d 1261 (Ohio Ct. App. 1996)).

In its claim, Gennari Consulting maintains that it has ownership rights over the inventory as a result of the gross profit distribution agreement. It does not argue that Wellington Corp or Mr. Kundel had any duty regarding the inventory separate from Wellington Corp's contractual duty under the gross profit distribution agreement. Accordingly, the conversion claim for withholding of inventory duplicates the breach of contract claim, precluding the opportunity to present this claim.

### II.C.2. Funds

Further, Gennari Consulting contends that Wellington Corp and Mr. Kundel converted its cash assets. (ECF No. 79, PageID #2126.) It argues that regardless of when the profit distribution agreement would have terminated or whether Mr. Kundel was justified in terminating the agreement, Gennari Consulting has a right to at least its share of the gross profits accrued between May 1, 2019 and termination on May 10, 2019, a period of time for which Gennari Consulting received no payment. (*Id.*, PageID #2127.)

A plaintiff can state a claim for conversion involving money only where the funds are earmarked or otherwise specifically capable of identification. *Wiggins*, 488 F. Supp. 3d at 639 (citing *Haul Transp. of VA, Inc. v. Morgan*, No. CA 14859, 1995 WL 328995, at *4 (Ohio Ct. App. June 2, 1995)). In other words, conversion only occurs where there is an obligation to deliver specific money rather than merely to deliver a certain sum. *Id.* (citing *Macula v. Lawyers Title Ins. Corp.*, No. 1:07-cv-1545, 2008 WL 3874686, at *5 (N.D. Ohio Aug. 14, 2008)).

Gennari Consulting does not contend that there are any readily identifiable funds that could sustain a conversion claim for specific money.  Further, it seeks the sum owed pursuant to the gross profit distribution agreement.  Accordingly, like the conversion claim relating to inventory, Gennari Consulting's conversion claim relating to gross profits duplicates its contract claim and may not proceed.

*  *  *

Because Gennari Consulting's conversion claim is based on the same actions as the contract claim, Ohio law does not permit the conversion claim to proceed. *Toledo Mack Sales & Serv.*, 437 F. App'x at 385.  Therefore, Wellington Corp and Mr. Kundel are entitled to judgment on this claim as a matter of law.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Gennari Defendants' motion for summary judgment (ECF No. 73) and **GRANTS IN PART AND DENIES IN PART** Wellington Corp's and Mr. Kundel's motion for summary judgment (ECF No. 74).  Specifically, the Court **GRANTS** the motion on the conversion and civil theft claim (Count III) and **DENIES** the motion on the breach of contract (Count I) and unjust enrichment (Count II) counterclaims.  (ECF No. 69.)  Accordingly, the only remaining claims in this action are Defendant Gennari Consulting's counterclaims against Plaintiff Wellington Corp for breach of contract (Count I) and unjust enrichment (Count II).  (*Id*.)

**SO ORDERED.**

Dated:  September 27, 2022

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio